United States District Court
For the Western District of Michigan

| | |
|---|---|
| **Randall E. Dill**,<br><br>*Plaintiff,*<br><br>v.<br><br>**International Business Machines Corporation,**<br>Serve Registered Agent at:<br>C T Corporation System<br>40600 Ann Arbor Rd. E., Suite 201<br>Plymouth, MI 48170<br><br>*Defendant.* | Civil Action No.: _____<br><br>**COMPLAINT AND JURY DEMAND** |

COMES NOW Plaintiff Randall E. Dill, by and through the undersigned counsel, and alleges as follows:

### NATURE OF THE ACTION

1.  This is a lawsuit to remedy unlawful employment conduct, namely discrimination based on race and sex. As alleged further herein, Mr. Dill was a model employee at IBM Consulting, most recently having completed a four-year assignment at the Department of Defense, where he received outstanding performance reviews. Then, in July 2023, out of the blue, IBM placed Mr. Dill on a pretextual, vague, and unmeasurable Performance Improvement Plan, offered him no support, and terminated him in October. At the same time, corporate leadership was under pressure from the CEO and financially incentivized to hire people based on their skin

1

color and sex. Mr. Dill, not being in the current preferred demographic, was terminated so IBM could pursue its illegal racial quotas.

2. Title VII Civil Rights Act of 1964 prohibits employment discrimination on the basis of race or sex in the United States.

3. Defendant International Business Machines Corporation ("IBM") engages in intentional discrimination based on race and sex through the guise of "Diversity & Inclusion," and it pushes its business divisions and subsidiaries, including IBM Consulting, to do the same.

4. As part of its Diversity & Inclusion program, IBM reports demographic statistics regarding its employees in its Annual Reports to investors, its annual ESG Reports, and its Form 10-Ks filed with the United States Securities and Exchange Commission (through incorporation by reference).

5. IBM incentivizes its executives to engage in impermissible race and sex discrimination by having "executive compensation metrics that include a diversity modifier to reinforce our focus and continued accountability for improving the diverse representation of our workforce." Int'l Bus. Mach. Corp., 2022 Annual Report 16 (2023) (available at https://perma.cc/5PX2-9L2W). In other words, IBM conditions executive compensation on how much the company discriminates in hiring.

6. In this case, IBM engaged in sex- and race-based employment discrimination against Mr. Dill in violation of the Civil Rights Act of 1866 and Title VII of the Civil Rights Act of 1964.

7.     Mr. Dill brings this action to vindicate his rights under these statutes and obtain legal and equitable redress for IBM's unlawful discrimination.

## THE PARTIES

8.     The Plaintiff, Randall E. Dill, is a citizen and resident of the State of Michigan. He resides in Muskegon, Michigan. He is a Caucasian male.

9.     Defendant IBM is a Delaware Corporation with its principal place of business in Armonk, New York.

10.    IBM has been registered as a foreign corporation in the State of Michigan since December 1, 1933, and its current identification number is 800996961.

## JURISDICTION AND VENUE

11.    This Court has subject-matter jurisdiction under 28 U.S.C. §1331 because the federal claims arise under the Constitution and laws of the United States.

12.    This Court has personal jurisdiction over Defendant IBM because IBM does substantial business in Michigan, and Mr. Dill's claims relate to IBM's employment of him and supervision of his activities in Michigan.

13.    As stated above, IBM is a registered foreign corporation in the State of Michigan. IBM's registered agent is CT Corporation System, located in Plymouth, MI. They can accept service for IBM at 40600 Ann Arbor Rd E, Suite 201, Plymouth, Michigan 48170.

14.    As a foreign corporation possessing a Certificate of Authority and authorized to transact business in Michigan, IBM "is subject to the same duties,

3

restrictions, penalties, and liabilities of a similar domestic corporation." MICH. COMP. LAWS § 450.2002(1).

15. IBM employs many Michiganders and maintains offices in Ann Arbor, Benton Harbor, the Detroit area, Grand Rapids, Kalamazoo, Lansing, Midland, Southfield, and Troy.

16. Venue is proper in this District because it is where the alleged violation occurred and the "judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice." 42 U.S.C. § 2000e-5(f)(3).

17. On July 11, 2024, Plaintiff filed a Charge of Discrimination against each IBM with the Equal Employment Opportunity Commission (EEOC), complaining of acts of discrimination alleged herein. This was assigned EEOC Charge Number 471-2024-05834. A true copy of the Charge of Discrimination and the filing documents is attached as **Exhibit A** to the Complaint.

18. On July 19, 2024, the EEOC issued the Plaintiff a Notice of Right to Sue for his Charge. A true copy of the Right to Sue Letter is attached as **Exhibit B** to the Complaint.

19. Plaintiff has fully exhausted all administrative remedies and prerequisites for the commencement of this action.

20. An actual and justiciable controversy exists between Plaintiff and Defendant.

# FACTS

## A. Mr. Dill's Outstanding Job History and Performance

21. Mr. Dill began his employment with IBM in October 2016.

22. Mr. Dill was a Senior Managing Consultant for IBM Consulting, a division within IBM, and worked remotely from his home in Muskegon, Michigan.

23. Mr. Dill's job was to support existing IBM clients on long-term projects.

24. When he was assigned to a project that was his primary client project for many months or even years.

25. When his support of that client was done, he would go back into a pool of people awaiting a new long-term assignment, or what was internally called "on the bench."

26. At no point was Mr. Dill's job to develop or sign new clients or client leads; all of his work was for *existing* IBM clients.

27. During his tenure, Mr. Dill consistently received high scores on IBM Consulting's internal employee performance metric, the Net Promoter Score.

28. The Net Promoter Score is mainly derived from client feedback and is a satisfaction measurement based on asking clients how likely they are, on a scale of 1–10, to recommend the IBM employee servicing the contract.

29. The Net Promoter Score is the primary performance metric for IBM Consulting.  It is the primary metric for measuring how work at a client site is proceeding.  The survey is initiated by IBM, which goes directly to the client, and the employee being reviewed is not involved.

30. Mr. Dill's leadership discussed the Net Promoter Score routinely at monthly all-hands meetings, where they emphasized the importance of this metric and where they would read quotes from specific reviews to highlight good work.

31. IBM considers a Net Promoter Score of 8/10 as a sign of good work and client satisfaction with the IBM employee.

32. During his last four years with IBM, Mr. Dill worked on a contract for TACOM, a component of the United States Army.

33. Mr. Dill received two Net Promoter Scores during those four years. Each time TACOM reviewed Mr. Dill's work, he received a 9/10 Net Promoter Score, among the best scores within his segment of IBM Consulting.

34. Mr. Dill's scores were, on multiple occasions, referenced, quoted, and applauded during monthly all-hands calls by the Division President.

35. In fact, Mr. Dill was recognized for his outstanding work in an all-hands meeting and had verbatims read from his score in June 2022 and again in early 2023.

**B. Mr. Dill's Termination was not Performance Related**

36. In July 2023, with no notice, prior performance complaints, or any warning, IBM—acting through Jay Zook (Mr. Dill's supervisor)—placed Mr. Dill on a Performance Improvement Plan ("PIP").

37. Mr. Zook's explanation for placing him on the PIP was his "low utilization" rate and that he was "not bringing in the work."

38. Before the PIP, IBM never required or made any notice of expectation to Mr. Dill that his job required soliciting or developing new clients. In fact, neither

of these activities was ever within his job description or control. The position description of Mr. Dill's role at IBM as a Senior Management Consultant is attached as **Exhibit C**.

39. The PIP was unrelated to Mr. Dill's position description, performance review metrics, and the job functions he had been performing for nearly seven years. A true copy of the PIP is attached as **Exhibit D**.

40. IBM's proffered reasoning for placing him on the PIP is that he was not being fully utilized and had not been placed with a client.

41. Both of these factors were out of his control, though. In fact, at the time he was terminated, over half of his division was "on the bench" or awaiting a long-term assignment due to a lack of client work for the division.

42. Another Reason IBM gave for placing him on the PIP was "Team member skills not meeting Client demand." *See* Ex. D.

43. This reason is belied by his Net Promoter Scores and the fact that the testimonials from his reviews were read at all-hands meetings.

44. As to the goals of the PIP, the first goal was "Identify the necessary self-improvement steps or actions to better position you to deliver at full utilization." *Id.*

45. This goal is entirely subjective and lacks any metric for evaluation.

46. The only tangible metric in the PIP, "Full utilization by November 1," was an outcome that was entirely out of Mr. Dill's control as he possessed no ability to assign himself to projects or client matters. *Id.*

47. Similarly, the Plan called for Mr. Dill to "Feed yourself – develop and sale new business." *Id.*

48. This, too, was a completely new workstream as Mr. Dill's job was never sales-related, and he had always worked with existing IBM clients.

49. Despite being caught off guard by being placed on the PIP, due to his history of strong performance reviews, Mr. Dill made a good-faith effort to meet its terms and criteria and stay with IBM by following every piece of the action plan that was within his control.

50. For instance, he looked for and applied to open seats at IBM, including positions that were outside his area of expertise. He also wrote a marketing plan for himself to meet the "internal marketing" action plans.

51. Mr. Dill even worked to leverage personal and professional relationships to try and secure a new client for IBM. He had conversations with his supervisor, Mr. Zook, who was fully aware of the situation.

52. In fact, Mr. Dill requested business development resources from within IBM to help him turn this lead into an actual client—a modest request, considering sales and client development had never been a part of his work.

53. In response, IBM supplied one person, Lee Alves, to assist. Mr. Alves spoke only once to Mr. Dill before Mr. Dill could no longer get ahold of Mr. Alves, despite several emails and requests for further assistance.

54. Then, approximately two weeks prior to his termination, Mr. Zook told Mr. Dill that IBM would not provide him with any more resources to secure the prospective client. Mr. Zook told Mr. Dill, "You are on your own."

55. As the end date of the PIP approached, Mr. Dill began to realize that the PIP was never about being successful and improving his performance in order to maintain his job with IBM. Rather, the die was cast well beforehand and IBM put Mr. Dill on the PIP as a pretext to force him out of the company due to IBM's stated quotas related to sex and race.

56. On October 31, 2023, IBM terminated Mr. Dill's employment.

57. After he was terminated, Mr. Dill requested meetings with IBM's Human Resources department to understand why he was terminated and what recourse he might have. His requests for meetings were denied or left unanswered.

58. On July 11, 2024, Mr. Dill timely filed his Charge of Discrimination with the EEOC. *See* **Ex. A**.

C. **IBM's Facially Discriminatory Policies**

59. Since at least 2022, IBM has engaged in sex- and race-balancing in its employment practices.

60. IBM has documented its goals and progress in implementing this race and sex-based balancing initiative in corporate documents. *See* Int'l Bus. Mach. Corp., 2024 Notice of Annual Meeting and Proxy Statement 36 (2024) (available at https://perma.cc/FE9T-6BJ9); Int'l Bus. Mach. Corp., 2023 Annual Report 16 (2024)

(available at https://perma.cc/Q7KC-PEK7); Int'l Bus. Mach. Corp., 2022 Annual Report 16 (2023) (available at https://perma.cc/5PX2-9L2W).

61. Statements by high-ranking corporate officials, including Chief Executive Officer Arvid Krishna, have reinforced these goals.

62. On December 11, 2023, an undercover video posted to the social media platform X showed IBM's Chief Executive Officer and Board Chairman, Arvind Krishna, discussing its discriminatory policies. James O'Keefe (@JamesOKeefeIII), X (Dec. 11, 2023, 6:47 PM), https://perma.cc/2HLR-X5VT.

63. The video portrays a corporate town hall meeting from 2021, during which Krishna responded to questions, including a question about IBM's "diversity, equity, and inclusion" activity and its efforts to promote and recruit members of employees based on their skin color and sex.

64. At one point, Krishna is asked, "IBM highlights their progress in promoting and recruiting underrepresented minorities in executive roles and holding executives accountable for DE&I goals. At Red Hat, executive representation is dismal, and there is no accountability for DEI work. *Why do you not hold Paul to the same standards for diverse staffing and leadership as IBM does*?" (emphasis added) *Id.* at 7:11–:31.

65. Krishna responded by stating that he holds Paul (the CEO of Red Hat, a company that had recently been acquired by IBM) to the exact same standards as he holds all other IBM executives. Those standards, he said, are that "all executives

10

in the company have to move forward by 1% on both underrepresented minorities … and gender. You've got to move both forward by a percentage." *Id.* at 7:49–8:06.

66. He then explained that if executives do that, "That leads to a plus on [their] bonus. By the way, if you lose, you lose part of your bonus." *Id.* at 8:09–:15.

67. Krishna continued, "Paul and I have been working together to say, 'Okay, how do we apply those deeper into the organization?'" *Id.* at 8:19–:22.

68. Krishna admitted that IBM's recruitment of women was at 41% but that it intends to "get to the representational demographics of the underlying populations." He then stated, "I am not trying to finesse this, so for blacks, we should try to get towards 13 point something percent. On Hispanics, you got to get into the mid-teens. On gender, okay, we are somewhere in the mid 30s, I think, for all of IBM. But think, if I know this right, the representational is 50." *Id.* at 8:47–9:13.

69. Paul Cormier, Red Hat Chairman, then added on to give additional "Red Hat flavor," saying, "We hold the leadership at Red Hat accountable for [DEI]. I mean, I'll be very candid, without an exception for privacy, I could name multiple leaders over the last year plus that were held accountable to the point that they're no longer here at Red Hat because they weren't willing to live up to the DE&I standards that we set." *Id.* at 9:48, 10:12–:30.

70. In 2021, IBM leadership admitted to reducing the pay and even firing executives who did not do enough to advance gender and racial quotas.

71. Conversely, executives who did engage in race- and sex-based hiring were financially rewarded.

11

72. On information and belief, after these 2021 comments were made, the culture and pressure to advance race- and sex-based quotas only increased as the corporate leadership's efforts to "apply those deeper into the organization" ramped up.

73. On information and belief, in order to meet the quotas and still stay under the "headcount" of maximum employees, some people needed to be terminated from IBM.

74. However, IBM did not want the appearance of layoffs in 2021 and 2022.

75. To deal with that problem, the Human Resources department instructed managers to use PIPs and "Resource Actions" to quickly and cheaply separate people from IBM.

76. At the time IBM placed Mr. Dill on the PIP, IBM's corporate policies incentivized executives to hire and promote individuals with favored race and sex traits, which did not include whites, Asians, or men. For Mr. Dill, being a white man was a double whammy.

77. Thus, the quota system is tied to bonus compensation in such a way that it incentivized impermissible racial discrimination and disincentivizes refusal to engage in such discrimination.

78. Specifically, Mr. Dill's superiors, Mike Chamberlain (President of Simpler, the unit of IBM Consulting in which Mr. Dill worked), Kevin Henning (Mr. Zook's supervisor), and Mr. Zook all stood to financially benefit by removing Mr. Dill from IBM's employment.

12

## DAMAGES

79. As a result of his termination, Mr. Dill has suffered damages including, but not limited to, lost wages, embarrassment, economic and financial damages, and considerable stress and emotional damages.

80. Mr. Dill was unemployed for eight months and was only able to find employment as of June 2024 for a lower wage than what he was earning and outside of his field of expertise.

81. Mr. Dill has suffered reputational harm and embarrassment for being labeled a poor performer when he was terminated because of his skin color and for being a man.

## CLAIMS FOR RELIEF

### Count I
### Racial Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

82. The Plaintiff repeats and realleges each of the prior allegations.

83. Title VII makes it illegal for an employer "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1).

84. By instituting bonus incentives tied to racially preferential hiring and promotions quotas, IBM has established a discriminatory race-based employment policy.

85. Because of these quotas, Mr. Dill's superiors were motivated to find ways to reduce the number of employees in the non-preferred race category.

86. The adverse action on Mr. Dill's employment directly results from these racially discriminatory quotas.

87. As a result of Defendant IBM's discriminatory conduct, Plaintiff suffered significant damages, including lost wages, loss of professional and career development opportunities, and significant non-economic injuries, including humiliation, embarrassment, and loss of reputation.

88. IBM's above-described conduct and repeated acts of discrimination targeting Plaintiff for termination on the basis of his race violates Title VII.

89. The violations articulated in this complaint were done with malice and/or reckless indifference to Plaintiff's protected rights and warrant an award of punitive damages.

90. As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered the damages and losses set forth herein.

### Count II
### Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

91. Plaintiff repeats and realleges each of the prior allegations.

92. Title VII makes it illegal for an employer "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because

of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1).

93. By instituting bonus incentives tied to sex-based preferential hiring and promotions quotas, IBM has established a discriminatory employment policy based on sex.

94. Because of these quotas, Mr. Dill's superiors were motivated to find ways to reduce the number of employees in the non-preferred sex category.

95. The adverse action on Mr. Dill's employment is the direct result of these discriminatory quotas.

96. As a result of Defendant IBM's discriminatory conduct, Plaintiff suffered significant damages, including lost wages, loss of professional and career development opportunities, and significant non-economic injuries, including humiliation, embarrassment, and loss of reputation.

97. IBM's above-described conduct and repeated acts of discrimination targeting Plaintiff for termination on the basis of his race violates Title VII.

98. The violations articulated in this complaint were done with malice and/or reckless indifference to Plaintiff's protected rights and warrant an award of punitive damages.

99. As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered the damages and losses set forth herein.

**Count III**
**Violation of the Civil Rights Act of 1866, 42 U.S.C. §1981**

100. Plaintiff repeats and realleges each of the prior allegations.

15

101. 42 U.S.C. §1981(a) prohibits race-based consideration in making and enforcing contracts, including employment contracts.

102. Section 1981 covers private parties like IBM. The Act applies to governmental and "nongovernmental" actors, §1981(c), and provides a cause of action for public or private discrimination based on race. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975). Section 1981 authorizes "both equitable and legal relief," including "damages." *Id.* at 460.

103. Moreover, an employer cannot "discriminate against some employees on the basis of race," like white men, "merely because he favorably treats other members" of that race, like white women. *Connecticut v. Teal*, 457 U.S. 440, 455 (1982). "So long as the plaintiff's [race] was one but-for cause" of his exclusion, "that is enough." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020); *accord Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 340–41 (2020).

104. In its quest to achieve its DEI goals, IBM intentionally discriminated against Mr. Dill based on his race. Mr. Dill's race (white) was a "but for" reason or determinative factor in IBM's decision to terminate Plaintiff.

105. The statements by IBM's CEO and other senior corporate officers demonstrate that IBM is motivated by race- and sex-based considerations, showing its intent to discriminate on such bases.

106. IBM intentionally discriminated against Mr. Dill because of race. But for IBM's racial discrimination against the Plaintiff, he would not have been terminated.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Dill respectfully requests that this Court enter judgment in his favor and against IBM with respect to each separate Count, and provide the following relief:

A. An order for such equitable relief, including back pay, as will make Randall E. Dill whole for the Defendant's conduct; compensatory damages; punitive damages; and prejudgment and post-judgment interest.

B. Awarding compensatory damages to Mr. Dill for past pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, which he has suffered as a result of Defendant's improper conduct.

C. An award of other such damages as appropriate for violations of Title VII and 42 U.S.C. §1981.

D. An order for damages under 42 U.S.C. §1986.

E. Declaratory Judgment that IBM self-proclaimed DE&I policies violate the Civil Rights Act of 1866 and the Civil Rights Act of 1964.

F. Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws.

G. Such other relief as the Court deems just, proper, or equitable, including other equitable and injunctive relief providing restitution for past violations and preventing future injury and harm.

**JURY DEMAND**

The plaintiff herein demands trial by jury on all Counts so triable.

Dated: August 20, 2024                                   Respectfully submitted,


*/s/ Christopher S. Berry*                               */s/ Andrew J. Block*

Christopher S. Berry (P68580)                            Reed D. Rubinstein, MI Bar P40193
SMITH HAUGHEY RICE & ROEGGE                              Andrew J. Block*
100 Monroe Center NW                                     Laura M. Stell*
Grand Rapids, MI 49503                                   AMERICA FIRST LEGAL FOUNDATION
Phone: (616)458-3444                                     611 Pennsylvania Ave. SE #231
Email: cberry@shrr.com                                   Washington, D.C. 20003
                                                         Telephone: (202) 836-7958
                                                         Email: Andrew.block@aflegal.org
                                                         Laura.Stell@aflegal.org
                                                         Reed.rubinstein@aflegal.org

                                                         *Counsel for Petitioner*
                                                         **Applications for Admission Forthcoming*