UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Randall E. Dill,

        Plaintiff,                           Case No. 24-cv-00852

v.                                       Hon. Hala Y. Jarbou

International Business Machines Corporation,        Mag. Phillip J. Green

        Defendant.                *Oral Argument Requested*

---

### Plaintiff's Response to Motion to Dismiss

Plaintiff, Randall E. Dill, by and through the undersigned counsel, for his response to the Motion to Dismiss filed by Defendant International Business Machines Corp. ("IBM"), states:

For reasons further explained in the attached Brief, IBM's Motion should be denied. "[R]acial discrimination [is] invidious in all contexts." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181, 214 (2023) (citation omitted). This means no one, not even IBM, can lawfully "desire some specified percentage of a particular group merely because of its race or ethnic origin." *Id.* at 211 (cleaned up). But that is what IBM has done and will keep doing. As IBM's CEO admitted, IBM employs quotas that are designed to "get to the representational demographics of the underlying populations … So, for blacks, we should try to get towards 13 point something percent. On Hispanics, you got to get into the mid-teens. On gender, okay, we are somewhere in the mid-30s, I think, for all of IBM. But I think if I notice right, the representational is 50." ECF No. 1 ¶¶ 62, 68, PageID.10-11.

IBM gives its executives two choices: discriminate or lose your job. IBM uses its "diversity modifier" to shackle executive compensation to meeting race-, color-, national origin-, sex-, and ancestry-based employment quotas. If an IBM executive meets the quotas, IBM gives them the

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

carrot: a plus on their bonus. ECF No. 1 ¶ 71, PageID.11. But if he or she fails to meet it, IBM swings the stick: they lose part of their bonus and, eventually, their job. *Id.*. ¶ 70, PageID.11. Indeed, IBM even requires a specified amount of progress towards those quotas: one percentage point per year, or "you lose part of your bonus." *Id.* ¶¶ 65–66, PageID.10-11. IBM has made clear its goals of using discriminatory and insufficiently tailored means to bring about discriminatory and unjustifiable ends. But such discrimination is zero-sum. For a preferred demographic to gain, another must lose.

The adverse employment actions Plaintiff suffered—being placed on a performance improvement plan and, eventually, terminated—were based on pretexts. The truth is that IBM needed Plaintiff out of the way to make room for candidates of the preferred races and gender. All of this is laid out in Plaintiff's Complaint. Plaintiff has therefore pled (1) adequate reason to infer that his own termination was motivated by race or sex and (2) "background circumstances" that support a "suspicion that the defendant is that unusual employer who discriminates against the majority." *Zambetti v. Cuyahoga Cmty. Coll.,* 314 F.3d 249, 256 (6th Cir. 2002). Accordingly, Defendant's Motion to Dismiss must be denied.

Dated: November 20, 2024                    Respectfully submitted,

*/s/ Christopher S. Berry*                    */s/ Andrew J. Block*
Christopher S. Berry (P68580)                Andrew J. Block
SMITH HAUGHEY RICE & ROEGGE                  Laura M. Stell
100 Monroe Center NW                         AMERICA FIRST LEGAL FOUNDATION
Grand Rapids, MI 49503                       611 Pennsylvania Ave. SE #231
Phone: (616)458-3444                         Washington, D.C. 20003
Email: cberry@shrr.com                       Telephone: (202) 836-7958
                                             Email:  Andrew.block@aflegal.org
                                                     Laura.Stell@aflegal.org
                                             *Counsel for Petitioner*

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Randall E. Dill,

        Plaintiff,                             Case No. 24-cv-00852

v.                                        Hon. Hala Y. Jarbou

                                           Mag. Phillip J. Green

International Business Machines Corporation,

        Defendant.                 *Oral Argument Requested*

---

## **Brief in Support of Plaintiff's Response to Motion to Dismiss**

## **Table of Contents**

INTRODUCTION ............................................................................................ 1

STATEMENT OF FACTS ............................................................................... 1

    I.     IBM maintains an ongoing policy of discrimination. ..................... 1

    II.    Mr. Dill was, for years, a model employee. ................................... 2

    III.   Mr. Dill was put on a pretextual pip unrelated to performance,
           then terminated. .......................................................................... 4

STANDARD OF REVIEW .............................................................................. 6

    I.     Fed. R. Civ. P. 12(b) standards. ..................................................... 6

    II.    Title vii and § 1981 framework. ................................................... 7

ARGUMENT ................................................................................................... 8

    I.     Plaintiff has pled both direct and circumstantial evidence of
           pretextual termination and discrimination. ..................................... 9

         a)    Plaintiff's PIP was merely a pretext in preparation for his
              unlawful termination. ......................................................... 9

         b)    The Plaintiff's job performance does not explain his
              termination. ..................................................................... 10

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

c)    Mr. Dill has alleged background circumstances that confirm IBM's discriminatory policies and intentions. .................... 11

II.    Plaintiff has met the applicable pleading standard. ....................................... 13

a)    Defendants misapply the *McDonnell Douglas* prima facie standard. ............................................................................. 13

b)    Even if *McDonnell Douglas* applied to pleadings, Plaintiff has met the standard. ........................................................ 17

c)    Mr. Dill has demonstrated background circumstances that support the suspicion that IBM discriminates against majority demographics. .................................................... 18

III.    IBM's defenses combine non sequiturs with inappropriate evidentiary disputes. ..................................................................... 20

CONCLUSION ........................................................................................................ 25

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

# Index of Authorities

**RULES**

Fed. R. Civ. P. 12(b)(6)................................................................................................6, 8, 9, 12

**CONSTITUTIONAL PROVISIONS**

42 U.S.C. § 2000e-2.........................................................................................................18, 21

42 U.S.C. §1981.......................................................................................................................7

**CASES**

*Ames* and *Toth v. City of Toledo*, 480 F. App'x 827 (6th Cir. 2012) ....................................12

*Ames v. Ohio Dep't of Youth Servs.*, 87 F.4th 822 (6th Cir. 2023) ........................12, 17, 18

*Ashcroft v. Iqbal,* 556 U.S. 662, (2009)..................................................................................6

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) ......................................................6, 14

*Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862 (6th Cir. 2001).........................................7

*Donaldson v. DeJoy*, No. 22-1651, 2024 WL 3493870 (6th Cir. May 1, 2024).................12

*Downs v. Bel Brands USA, Inc.,* 613 F. App'x 515 (6th Cir. 2015) ....................................15

*Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc.,* 285 F. Supp. 2d 1180 (N.D. Iowa 2003) ...................23

*Franko v. City of Cleveland,* 654 F. Supp. 2d 711 (N.D. Ohio 2009) ..........................7, 8, 19

*Gavitt v. Born,* 835 F.3d 623 (6th Cir. 2016).........................................................................7

*Gover v. Speedway Super Am., LLC,* 254 F. Supp. 2d 695 (S.D. Ohio 2002).....................23

*Hilliard v. Shell W. E & P, Inc.*, 885 F. Supp. 169 (W.D. Mich. 1995)....................9, 11, 12

*Inner City Contracting, LLC v. Charter Twp. of Northville, Michigan,* 87 F.4th 743 (6th Cir. 2023). 14, 21

*Jelovsek v. Bredesen,* 545 F.3d 431 (6th Cir. 2008) ..............................................................7

*Johnson v. Metro. Gov't of Nashville & Davidson Cty.,* 502 F. App'x 523 (6th Cir. 2012)...........19, 20, 24

*Keys v. Humana, Inc.,* 684 F.3d 605 (6th Cir. 2012) .......................................................13, 14

*McCormick v. Gasper*, No. 22-1033, 2022 WL 16586621, at *4 (6th Cir. Nov. 1, 2022) ..................24, 25

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) ...........................................passim

*Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir. 1994)....................................18

*Preston v. Fed. Express Corp.,* 373 F. Supp. 3d 1172 (W.D. Tenn. 2019)..........................19

*Rhodes v. R & L Carriers, Inc.*, 491 F. App'x 579 (6th Cir. 2012) ..............................passim

*Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544 (6th Cir. 2004) .....................24

*Sam Han v. Univ. of Dayton*, 541 F. App'x 622 (6th Cir. 2013) .........................................15

*Serrano v. Cintas Corp.*, 699 F.3d 884 (6th Cir. 2012) .......................................................13

*Singfield v. Akron Metro. Housing Auth.,* 389 F.3d 555 (6th Cir. 2004) ...............................8

*Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321 (11th Cir. 2011).................................23, 24

*Smith v. Wrigley Mfg. Co., LLC,* 749 F. App'x 446 (6th Cir. 2018).....................................15

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181 (2023)...... 1, 25

*Sutherland v. Mich. Dep't of Treasury,* 344 F.3d 603 (6th Cir.2003).....................................18

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)........................................................13, 14

*Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981) ................................................8

*Weberg v. Franks,* 229 F.3d 514 (6th Cir. 2000)................................................................7, 8

*Young v. Warner-Jenkinson Co.,* 152 F.3d 1018 (8th Cir. 1998) ...................................23, 24

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

## INTRODUCTION

This is a lawsuit to remedy unlawful employment conduct: discrimination based on race and sex. As set forth in his Complaint, Mr. Dill was a model employee at IBM Consulting. He had recently completed a four-year assignment where he received outstanding performance reviews. Then, in July 2023, out of the blue, IBM placed Mr. Dill on a pretextual Performance Improvement Plan ("PIP"), told him he was on his own, and terminated him in October 2023. At the same time, corporate policies financially incentivized managers to make employment decisions based on skin color and sex. Mr. Dill, not being in a preferred demographic, was terminated so IBM could pursue its illegal racial quotas. Plaintiff has cogently pled claims for race and gender discrimination under Title VII and 42 U.S.C. §1981. IBM's Motion to Dismiss must, therefore, be denied.

## STATEMENT OF FACTS

### I.    IBM maintains an ongoing policy of discrimination.

Since at least 2021, IBM has engaged in sex- and race-balancing in its employment practices. ECF No. 1 ¶ 59, PageID.9. IBM has documented its goals and progress in implementing this race and sex-based balancing initiative in corporate documents such as its Annual Reports, Proxy Statements, and Form 10-Ks. *Id*. ¶¶ 4–5, 60, PageID.2, 9. Statements by high-ranking corporate officials, including Chief Executive Officer and Board Chairman Arvid Krishna, have reinforced these goals and indicated they go much further than "balancing." *Id*. ¶ 61, PageID.10.

For example, on December 11, 2023, an undercover video posted to the social media platform X showed Mr. Krishna discussing IBM's discriminatory policies. *Id*. ¶ 62, PageID.10. The video portrays a corporate town hall meeting from 2021, during which Mr. Krishna responded to a question about IBM's efforts to promote and recruit employees based on their skin color and sex, and accountability for executives to meet certain standards. *Id*. ¶ 63, PageID.10. Mr. Krishna responded that he holds the CEO of Red Hat—a company that had IBM had recently acquired—to

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

1

the exact same standard that he holds all other IBM executives which was that, "All executives in the company have to move forward by 1% on both underrepresented minorities … and gender." *Id*., PageID.10. If the executives complied, they received "a plus on [their] bonus. By the way, if you lose, you lose part of your bonus." *Id*. ¶ 66, PageID.11. Mr. Krishna continued, "*I am not trying to finesse this*, so for blacks, we should try to get towards 13 point something percent. On Hispanics, you got to get into the mid-teens. On gender, okay, we are somewhere in the mid 30s." *Id*., PageID.11 (emphasis added).

Paul Cormier, Red Hat Chairman, then added some additional statements saying, "I'll be very candid, without an exception for privacy, I could name multiple leaders over the last year plus that were held accountable to the point that *they're no longer here* at Red Hat because they weren't willing to live up to the DE&I standards that we set." *Id*. ¶ 69, PageID.11 (emphasis added). Mr. Krishna gave no hint that Mr. Cormier's implication—that IBM executives could and would be *terminated* for failing to meet DEI quotas—was mistaken.

In short, IBM leadership admitted in 2021 to reducing the pay of, and even firing, executives who did not do enough to meet strict gender and racial quotas for their employees. *Id*. ¶ 70, PageID.11. Since that meeting, IBM has recommitted to these quotas each year in its corporate shareholder filings and measured its progress to meeting those quotas. *Id*. ¶ 60, PageID.9-10. Additionally, executives who engaged in discriminatory race- and sex-based employment practices have been financially rewarded. *Id*. ¶ 71, PageID.11.

## II.      Mr. Dill was, for years, a model employee.

About five years before this town hall, in October 2016, Mr. Dill began his employment with IBM. *Id*. ¶ 21, PageID.5. Mr. Dill was a Senior Managing Consultant for IBM Consulting, a division within IBM, and worked remotely from his home in Muskegon, Michigan. *Id*. ¶ 22,

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

PageID.5. Mr. Dill's job was to support existing IBM clients on long-term projects. *Id*. ¶ 23, PageID.5. When he was assigned to a project, that was his primary client project for many months or even years. *Id*. ¶ 24, PageID.5. When his support of that client was done, he would go back into a pool of people awaiting a new long-term assignment, or what was internally called being "on the bench." *Id*. ¶ 25, PageID.5. At no point was Mr. Dill's job to develop or sign new clients or client leads; all his work was for existing IBM clients. *Id*. ¶ 26, PageID.5.

During his tenure, Mr. Dill consistently received high scores on IBM Consulting's internal employee performance metric, the Net Promoter Score. *Id*. ¶ 27, PageID.5. The Net Promoter Score—the primary performance metric for IBM Consulting to measure how work at a client site is proceeding—is derived mainly from client feedback and is a satisfaction measurement based on asking clients how likely they are, on a scale of 1 to 10, to recommend the IBM employee servicing the contract. *Id*. ¶ 28–29, PageID.5. Mr. Dill's leadership routinely emphasized the importance of this metric and would read quotes from specific reviews to highlight good work. *Id*. ¶ 30, PageID.6. IBM considers a Net Promoter Score of 8/10 as a sign of good work and client satisfaction with the IBM employee. *Id*. ¶ 31, PageID.6.

During his last four years with IBM, Mr. Dill worked on a contract for TACOM, a component of the United States Army. *Id*. ¶ 32, PageID.6. Mr. Dill received two Net Promoter Scores during those four years. *Id*. ¶ 33, PageID.6. Each time TACOM reviewed Mr. Dill's work, he received a 9/10 Net Promoter Score. Quotes from Mr. Dill's review were, on multiple occasions, highlighted during monthly all-hands calls by the Division President. *Id*. ¶ 34, PageID.6. In fact, Mr. Dill was recognized for his outstanding work in an all-hands meeting and had verbatims read from his score in June 2022 and again in early 2023. *Id*. ¶ 35. PageID.6.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

III.    **Mr. Dill was put on a pretextual pip unrelated to performance, then terminated.**

But in July 2023, with no notice, prior performance complaints, or any warning, IBM—acting through Jay Zook (Mr. Dill's supervisor)—placed Mr. Dill on a PIP. *Id*. ¶ 36, PageID.6. Mr. Zook's explanation for placing him on the PIP was his "low utilization" rate and that he was "not bringing in the work." *Id*. ¶ 37, PageID.6. Before the PIP, IBM never required or made any notice of expectation to Mr. Dill that his job required soliciting or developing new clients. *Id*. ¶ 38, PageID.6-7. In fact, neither of these activities was ever in his job description or within his control. *Id*. ¶ 38, PageID.6-7; *see also* ECF No. 1-3 at 2, PageID.32 (Mr. Gill's job description as Senior Management Consultant, making no reference to sales or client development responsibilities).

In truth, the PIP was unrelated to Mr. Dill's position description, performance review metrics, and the job functions he had been performing for nearly seven years. ECF No. 1 ¶ 39, PageID.7. IBM's proffered reasoning for placing him on the PIP is that he was not being fully utilized and had not been placed with a client, although both factors were out of his control. *Id*. ¶¶ 40–41, PageID.7. In fact, at the time he was terminated, over half of his division was "on the bench," awaiting a long-term assignment due to a lack of client work in the division. *Id*., PageID.7.

Another reason IBM gave for placing him on the PIP was "[t]eam member skills not meeting Client demand." *Id*. ¶ 42, PageID.7. This was belied by his Net Promoter Scores and the fact that the testimonials from his reviews were read at all-hands meetings. *Id*. ¶ 43, PageID.7. Far from failing to meet client demands, Mr. Dill was a model employee who had so impressed IBM's clients that Mr. Dill's supervisors would read his performance reviews aloud in all-hands meetings as an example to his peers. *Id* ¶ 35, PageID.6.

The PIP included goals such as: "[i]dentify the necessary self-improvement steps or actions to better position you to deliver at full utilization." *Id*. ¶ 44, PageID.7. Such goals are entirely

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

subjective and lack any metric for evaluation. *Id.* ¶ 45, PageID.7. The only tangible metric in the PIP, "[f]ull utilization by November 1," was a demand wholly out of Mr. Dill's control, since he had no authority to assign himself to projects or client matters. *Id.* ¶ 46, PageID.7. Similarly, the Plan called for Mr. Dill to "[f]eed [him]self – develop and sale new business." *Id.* ¶ 47, PageID.8. This, too, implied a new workstream, as Mr. Dill's job was never sales-related; he had always worked with existing IBM clients. *Id.* ¶ 48, PageID.8.

Because of his history of strong performance reviews, Mr. Dill was caught off guard by being placed on the PIP. *Id.* ¶ 49, PageID.8. Nonetheless, he worked to meet its terms and criteria, and stay with IBM, by following every piece of the action plan that was within his control. *Id.*, PageID.8. For instance, he looked for and applied to open seats at IBM, including positions that would require developing new areas of expertise. *Id.* ¶ 50, PageID.8. He also wrote a marketing plan for himself to meet the "internal marketing" action plan. *Id.*, PageID.8. Mr. Dill even worked to leverage personal and professional relationships to try to secure a new client for IBM. *Id.* ¶ 51, PageID.8. He discussed his situation, and the opportunity, with his supervisor, Mr. Zook, who was fully aware of Mr. Dill's circumstances. *Id.*, PageID.8.

In fact, Mr. Dill requested business development resources from within IBM to help him turn this lead into an actual client—a modest request, considering sales and client development had never been a part of his work. *Id.* ¶ 52, PageID.8. In response, IBM supplied one person, Lee Alves, to assist. *Id.* ¶ 53, PageID.8. But Mr. Alves spoke only once to Mr. Dill before Mr. Dill could no longer get ahold of him, despite several emails and requests for further assistance. *Id.* It was clear that assistance would not be forthcoming. Then, approximately two weeks prior to his termination, Mr. Zook told Mr. Dill that IBM would not provide him with any more resources to secure the prospective client. *Id.* ¶ 54, PageID.9. Mr. Zook told Mr. Dill: "You are on your own."

*Id.*, PageID.9. While Mr. Dill was on the PIP, IBM continued to hire new employees who met IBM's diversity quotas and incentive structures, but he, an older white male, was pushed out the door. ECF No. 1-1, PageID.21.

As the end date of the PIP approached, Mr. Dill began to realize that the PIP was never about being successful and improving his performance to maintain his job with IBM. ECF No. 1 ¶ 55, PageID.9. Rather, the die was cast well beforehand. IBM put Mr. Dill on the PIP as a pretext to force him out of the company to support new hiring in line with IBM's stated sex and race quotas. *Id.*, PageID.9. On October 31, 2023, IBM terminated Mr. Dill's employment. *Id.* ¶ 56, PageID.9. After he was terminated, Mr. Dill requested meetings with IBM's Human Resources department to understand why he was terminated and what options he might have. His requests were denied or ignored. *Id.* ¶ 57, PageID.9.

On July 11, 2024, Mr. Dill timely filed his Charge of Discrimination with the EEOC. ECF No. 1-1, PageID.20. The EEOC issued his Right to Sue Letter on July 19, 2024. ECF No. 1-2, PageID.27. Mr. Dill filed this suit on August 20, 2024. IBM now moves to dismiss it on the pleadings.

## <u>STANDARD OF REVIEW</u>

### I.    Fed. R. Civ. P. 12(b) standards.

IBM moves to dismiss this suit under Fed. R. Civ. P. 12(b)(6). A complaint overcomes a challenge under Rule 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim is "plausible on its face" so long as the complaint's factual allegations "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). This standard "is not akin to a 'probability requirement,' but it asks for more than a

SHRR\6294658.v1

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 556). The process of determining if a complaint sufficiently alleges a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679. Further, "[t]he complaint is viewed in the light most favorable to the [Plaintiff], the *allegations in the complaint are accepted as true,* and all reasonable inferences are drawn in [Plaintiff's] favor." *Gavitt v. Born,* 835 F.3d 623, 639–640 (6th Cir. 2016) (citing *Jelovsek v. Bredesen,* 545 F.3d 431, 434 (6th Cir. 2008)) (emphasis added).

## II.    Title vii and § 1981 framework.

Mr. Dill brings claims for race and gender discrimination under Title VII, and race discrimination under 42 U.S.C. §1981. Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts with public and private actors. *Franko v. City of Cleveland,* 654 F. Supp. 2d 711, 716 (N.D. Ohio 2009). "Section 101 of the Civil Rights Act of 1991 … expands the scope of § 1981 to encompass racial discrimination during the entire scope of the contractual relationship, including discrimination in the workplace." *Id*. "Section 1981 claims are examined under the same analytical framework applicable to Title VII claims." *Id.* at 717 (citing *Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862, 868 (6th Cir. 2001)).

Under either statute, after discovery has been completed a "plaintiff can prove a case of reverse discrimination by (1) offering direct evidence that race was a substantial factor in the employment decision, or by (2) offering circumstantial evidence of discrimination." *Franko*, 654 F. Supp. 2d at 717 (citing *Weberg v. Franks,* 229 F.3d 514, 522–23 (6th Cir. 2000)). "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Franko*, 654 F. Supp. 2d at 717 (citing *Weberg,* 229 F.3d at 522). "If the plaintiff presents direct evidence of discrimination, the burden of

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

persuasion shifts to the defendant to show that it would have taken the adverse employment action absent any discriminatory motive." *Franko*, 654 F. Supp. 2d at 717 (citing *Weberg,* 229 F.3d at 522).

Alternatively, plaintiffs can offer circumstantial evidence of discrimination using the *McDonnell Douglas* burden-shifting paradigm. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–253 (1981) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). "Under this standard, the plaintiff must provide circumstantial evidence from which a jury could draw an inference of discrimination." *Franko*, 654 F. Supp. 2d at 717 (citing *Singfield v. Akron Metro. Housing Auth.,* 389 F.3d 555, 561 (6th Cir. 2004)). "The plaintiff bears the burden of establishing a prima facie case of discrimination by the employer with proof he (1) is a member of a protected group; (2) was subject to an adverse employment decision; (3) was qualified for the position; and (4) was replaced by a person outside of the protected class." *Franko*, 654 F. Supp. 2d at 717. Once a plaintiff has established a prima facie face, either at trial or on summary judgment, the burden shifts to the defendants "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802).

## <u>ARGUMENT</u>

Mr. Dill has pled a case of discrimination sufficient to defeat a motion to dismiss. Defendant's arguments rely entirely on construing the allegations and pleadings in a way favorable to them—contrary to the Rule 12(b)(6) standard—and proffering alternative theories of the case based on evidence not in the record, which are also not properly before the Court on this posture. Defendant's arguments should be unavailing, as Mr. Dill has pled both direct and circumstantial facts showing the Defendant's discrimination against him based on his race and sex.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

## I.    Plaintiff has pled both direct and circumstantial evidence of pretextual termination and discrimination.

The Defendant's main argument, which they lead with, is the false assertion that Mr. Dill has not pled anything to suggest "that he was terminated due to IBM's general diversity and inclusion policies, rather than his failure to meet the basic requirements of his job." ECF. No. 11, PageID.64. Mr. Dill pled that his executives had financial, ideological, and job security incentives to meet certain race- and sex-based quotas. ECF No. 1 ¶¶ 60, 65–71, PageID.9-11. Meanwhile, despite his outstanding performance in his assigned duties, he was placed on a pretextual Performance Improvement Plan and terminated, for a stated reason (underutilization) outside his control and area of responsibility, while his business unit continued to hire people who met IBM's DEI quotas. These facts directly support Plaintiff's assertion that his adverse professional treatment and, ultimately, termination were not due to his performance and can only be explained by racial and gender discrimination.

### a) Plaintiff's PIP was merely a pretext in preparation for his unlawful termination.

The Defendant makes a telling implicit admission on page two of their memo when they say: "The far more reasonable inference from Plaintiff's allegation is that Plaintiff was terminated because he—and a large number of his colleagues—were underutilized." PageID.59. First, the law requires that all allegations be taken as true and all reasonable inferences drawn in favor of the nonmoving party. *Hilliard v. Shell W. E & P, Inc.*, 885 F. Supp. 169, 171 (W.D. Mich. 1995) ("The moving party has the burden of proving that no claim exists. All factual allegations in the complaint must be presumed to be true and reasonable inferences must be made in favor of the non-moving party."). Contrary to Defendant's argument, a Rule 12(b)(6) motion cannot succeed via the insertion of its own alternative inferences that are unfavorable to the non-movant.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

Second, the Defendant implicitly recognizes that the most favorable inference for them is that Mr. Dill being placed on a Performance Improvement Plan was pretextual; IBM merely hopes to persuade this Court that the pretext involved was that of concealed layoffs due to underutilization in Mr. Dill's division, rather than invidious discrimination. That is an evidentiary argument inappropriate for a motion to dismiss, but, more importantly, reveals that even the best inference for Defendant includes the PIP being pretextual. Further, if the Court were to ignore that the only permissible inference at this stage is that the pretext was to hide discrimination and adopt Defendant's impermissible inference that the pretext was to hide layoffs from the public, it would only raise another obvious question: Why, if Mr. Dill and his colleagues were "underutilized," was IBM continuing to hire people who met DEI goals? Of course, that is premature at this stage; where the Court must examine whether the Plaintiff has pled facts that, taken as true, support a claim of discrimination. The Plaintiff has done that and so the Court must deny the motion to dismiss.

### b)  The Plaintiff's job performance does not explain his termination.

Mr. Dill has pled facts to support the conclusion that he was an exemplary employee. While Defendants hope to justify his termination by claiming that Mr. Dill "fail[ed] to meet the basic requirements of his position," PageID.64, Mr. Dill's complaint spends four and a half pages reciting facts on how he had not only met the requirements of his position, but that he was a *literal* model employee in the sense that his client feedback was routinely offered as an aspirational example to his colleagues, *see* ECF No. 1 ¶¶ 21–58, PageID.5-9.

The notion that Mr. Dill was falling short of expectations is based entirely on the pretextual PIP, which held Mr. Dill accountable for performance metrics that were outside his control, were beyond his assigned duties, and, in most cases, were so subjective as to be effectively unmeasurable. *Id*. ¶¶ 37–48, PageID.6-8. Despite this, Mr. Dill made a good faith effort to comply with the terms of the PIP to the best of his abilities, even going so far as to lay the groundwork to bring in

new clients, although that wasn't his job. *Id*. ¶ 49–52, PageID.8. He requested resources to secure a potential client, but his boss told him "You are on your own," confirming that, unfortunately, the PIP had always been a pretext and Mr. Dill had been set up for failure. *Id*. ¶ 54, PageID.9.

> ### c)  Mr. Dill has alleged background circumstances that confirm IBM's discriminatory policies and intentions.

IBM policies incentivize its executives to engage in illegal and invidious discrimination based on race and gender. These are the very policies that led to Mr. Dill's pretextual termination. As discussed above, IBM's CEO explicitly delineated race and gender-based quotas for the company's hiring and promotions in 2021. *See* ECF No.1 ¶¶ 59–71, PageID.9-11. The CEO's marching orders placed IBM Executives under direct pressure to reach specific employment demographic quotas in the IBM workforce. *See id.* ¶ 65, PageID.10-11 ("[A]ll executives in the company have to move forward by 1% on both underrepresented minorities … and gender" and "[b]y the way, if you lose [as to those metrics], you lose part of your bonus."). The CEO's mandate went so far as to directly threaten the jobs of executives who failed to "live up to the DE&I standards that [IBM] set." *Id.* ¶ 69, PageID.11. To be clear, the CEO was not just stating that the hiring of *executives* must comply with DEI metrics—this directive impacted the comprehensive makeup of *all employees* at IBM. A company's top-executive announcing a clear edict to inflate the representation of minority employees naturally results in a detriment—and discrimination against—the majority. Therefore, as a white male employee at IBM, Plaintiff was unquestionably impacted by this policy and all reasonable inferences must be given in favor of the Plaintiff. *See Hilliard*, 885 F. Supp. at 171 ("All factual allegations in the complaint must be presumed to be true and reasonable inferences must be made in favor of the non-moving party."). Accordingly, this policy, from the highest position of leadership, incentivized by bonuses, punished through threat of termination, and reaffirmed annually in the company's corporate statements, sufficiently pleads "background

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

circumstances" to show that IBM "discriminates against the "majority," as required by the Sixth Circuit. *Ames v. Ohio Dep't of Youth Servs.*, 87 F.4th 822, 825 (6th Cir. 2023).

Citing *Ames* and *Toth v. City of Toledo*, 480 F. App'x 827 (6th Cir. 2012), IBM attempts to argue that Mr. Dill has not pled background circumstances. But neither *Ames* nor *Toth*—both of which were decided on a summary judgment posture—had evidence that decision makers were financially incentivized to discriminate against people of a certain race or sex. The Circuit in both *Ames* and *Toth* held that replacement by a member of the minority class was insufficient to meet the heighted pleading standard required by background circumstances. *Ames*, 87 F.4th at 825; *Toth*, 480 F. App'x at 833.

The sole case IBM cites affirming a 12(b)(6) dismissal of a Title VII claim is *Donaldson v. DeJoy*, No. 22-1651, 2024 WL 3493870 (6th Cir. May 1, 2024). In *Donaldson*, however, the Circuit upheld the district's dismissal of the case because it found that the *pro se* litigant had failed to allege not allege any facts that could plausibly support discrimination. *Id.* at 3. Specifically with respect to race and national origin, the Donaldson court held that the plaintiff had plead only "broad and conclusory allegations." *Id.* That is not the case here, where Mr. Dill has met both the 12(b)(6) standard and alleged background circumstances.

Here, Defendant simply disagrees with the merits of the allegations and seeks to prematurely discredit them. But this is an inappropriate inquiry before discovery. Defendant has provided no binding precedent that affirms dismissal on a 12(b)(6) motion based on the insufficiency of the alleged "background circumstances" and Mr. Dill is not required to demonstrate the merits of his allegations at this stage. If Mr. Dill has alleged any set of facts, taken as true, that would entitle him to relief, the Court must deny Defendant's motion. *Hilliard*, 885 F. Supp. at 171. Since he has pled facts supporting "background circumstances" the Court must deny the Defendant's motion.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

12

## II.    Plaintiff has met the applicable pleading standard.

Plaintiff has pled facts from which a reasonable court could draw the plausible inference that he had been discriminated against, which is what is required at the pleading stage. *See Rhodes v. R & L Carriers, Inc.*, 491 F. App'x 579, 584 (6th Cir. 2012). In its motion to dismiss, IBM hopes to apply an *evidentiary* standard, before any discovery has taken place, and misapplies even that standard by relying on readily distinguishable cases.

### a)    Defendants misapply the *McDonnell Douglas* prima facie standard.

The Defendant relies heavily on the four-part *McDonnell Douglas* test described above, ignoring that the test refers exclusively to "an evidentiary standard, not a pleading requirement," and so is inapt at this phase of litigation. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *see also Keys v. Humana, Inc.,* 684 F.3d 605, 610 (6th Cir. 2012) ("The district court's requirement that [Plaintiff] establish a prima facie case under *McDonnell Douglas* and its progeny is contrary to Supreme Court and Sixth Circuit precedent.").

Following the Supreme Court's lead, the Sixth Circuit has recognized that "[i]t is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case." *Keys*, 685 F.3d at 609 (quoting *Swierkiewicz*, 534 U.S. at 511). "[T]he precise requirements of a prima facie case can vary depending on the context and before discovery has unearthed the relevant facts and evidence, it may be difficult to define the appropriate formulation." *Keys*, 685 F.3d at 609; *see also Serrano v. Cintas Corp.*, 699 F.3d 884, 897 (6th Cir. 2012) ("[B]ecause 'the precise requirements of a prima facie case can vary depending on the context,' and the appropriate type of prima facie case may not be evident until discovery is conducted, it would be improper to impose 'a rigid pleading standard for discrimination cases.'" (quoting *Swierkiewicz*, 534 U.S. at 512)). Further, at the motion to dismiss stage, it remains possible "that discovery may produce direct evidence of

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

13

discrimination, rendering the *McDonnell Douglas* burden-shifting framework inapplicable to a plaintiff's claims." *Keys*, 684 F.3d at 609.

Thus, "the pleading requirements for Title VII claims are no different than those for other claims; they are subject to the same requirement of setting forth 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Plaintiff is not required to establish a *McDonnell Douglas* prima facie case on the pleadings. *Rhodes*, 491 F. App'x at 584 ("To survive a motion to dismiss, Rhodes need not establish a prima facie case to satisfy the pleading standards, but rather he must only state a plausible claim." (citing *Swierkiewicz*, 534 U.S. at 512)). Plaintiff has explained—and Defendants appear to accept[1]—that he was placed on a PIP for pretextual reasons, then terminated, despite being a model employee, all while IBM executives were being explicitly told that their compensation depended on changing the racial and gender makeup of their employees. That is plausible reason, on its face, to believe Mr. Dill's firing was illegally influenced by his race and/or gender, in violation of Title VII and § 1981.

IBM's argument that Mr. Dill's Complaint fails because it doesn't allege that he was treated differently than similarly-situated employees misses the mark. PageID.64. First, the "similarly-situated" inquiry only applies in cases based on "circumstantial" rather than "direct evidence of discrimination." *Inner City Contracting, LLC v. Charter Twp. of Northville, Michigan,* 87 F.4th 743, 755 (6th Cir. 2023). Here, Mr. Dill alleges direct evidence of discrimination in the form of the corporate statements and undercover video wherein Mr. Krishna declares that it is the corporate policy of IBM to apply unlawful racial and gender quotas at the expense of white males.

---

[1] As discussed, *supra*, IBM appears to argue that the PIP was merely a pretext to hide layoffs due to broader underutilization with Mr. Dill's division, rather than a pretext for racial discrimination. This is not the right time for parties to proffer competing theories of *why* Mr. Dill was pretextually fired—that comes after discovery—but Mr. Dill *was* pretextually terminated.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

Second, even "[w]here plaintiffs seek to make their contract discrimination case using circumstantial evidence," the "similarly-situated" *McDonnell Douglas* inquiry doesn't come into play until "after they proceed past the pleadings." *Id*. "At the motion to dismiss stage, plaintiffs need only to point to facts that make plausible their allegations." *Id*.

Defendant's support for its effort to rigidly apply the *McDonnell Douglas* test misses the mark, largely because the cases contain limited information about what their respective plaintiffs *failed* to allege. For example, the *Sam Han* plaintiff failed to offer a useful comparator, but also failed to offer *any* facts to imply a culture of racial discrimination or the sort of explicit race- and gender-based employment practices that Mr. Dill pled. *Sam Han v. Univ. of Dayton*, 541 F. App'x 622, 627 (6th Cir. 2013) ("Plaintiff argues that simply because he was good at his job and was an Asian-American male, he is entitled to a reasonable inference of race and gender discrimination after the University failed to renew his contract.").

Similarly, the plaintiff in *Downs* "pled only three facts that remotely implicate his age": he was over 40, other "older employees" had been offered early retirement packages (which is not an adverse employment action), and "other older employees were discharged for questionable reasons." *Downs v. Bel Brands USA, Inc.*, 613 F. App'x 515, 518–19 (6th Cir. 2015). Mr. Downs did not plead explicitly agist policies or ongoing hiring of younger employees while older employees were being fired, or anything of the kind. *Id*. Conversely, Mr. Dill *has* pled that IBM had explicitly racist and sexist employment policies, including tying executive compensation directly to hard race and gender quotas, and that IBM pushed him out while hiring new employees of IBM's preferred genders and races. Finally the *Downs* plaintiff also admitted he was fired after the company learned he was selling company property and keeping the proceeds of the sales. *Id*. at 517.

*Smith v. Wrigley Mfg. Co., LLC*, 749 F. App'x 446 (6th Cir. 2018), is particularly

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

instructive. The *Smith* plaintiff failed to allege details about comparable employees, but she also failed to allege just about anything else—her complaint included just a single paragraph of factual information. *Id*. at 447. However, although the sections of the case cited by Defendant imply that comparators may have saved Smith's case, the court also explained that her case could have been saved if she had pled a relevant culture of employment discrimination. *Id*. at 448 (contrasting *Smith* with *Rhodes v. R & L Carriers, Inc*., "where plaintiff alleged express statements from defendant's upper management endorsing the use of age in the hiring process"). The *Smith* court's invocation of *Rhodes* is especially instructive because it highlights that *McDonnell Douglas* is, at most, mildly instructive at the motion to dismiss stage.

In *Rhodes*, the plaintiff did not proffer a comparator in his pleadings, nor any information about whether he had been replaced, by whom he had been replaced, or whether any employees in comparable roles had experiences that reflected age discrimination. *Rhodes*, 491 F. App'x at 584. Instead, he pointed to comments made by upper management indicating a bias against older employees and even explicit targets for the average age of the workforce. *Id*. Despite a readily identifiable alternative theory for his termination (Mr. Rhodes had expressed disagreement with an array of company policies), his pleadings were more than sufficient to proceed. Mr. Rhodes' pleadings are shockingly similar—indeed, materially almost identical—to Mr. Dill's. Like Mr. Rhodes, Mr. Dill has pled that he "had done 'great' work at the company," *Id*.; *see also* ECF No. 1 ¶ 33, PageID.6, but that he was discharged nonetheless due to explicitly discriminatory policies, *compare Rhodes*, 491 F. App'x at 584 ("[T]he Executive Vice President, 'specifically stated in meetings that the average age of the workforce needed to be lowered to 32 years of age'") *with* ECF No. 1 ¶¶ 65–69, PageID.10-11. (IBM's CEO stating that company policy requires a percentage point per year shift in race and gender demographics to specific percentage markers.).

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

16

In short, the cases Defendant cites involve a dearth of pleadings entirely unlike Mr. Dill's Complaint. What Defendant's cited authority *can* do for the Court, however, is direct it to a relevantly similar case, *Rhodes*, where the Sixth Circuit had no difficultly holding that allegations without a comparator, but otherwise materially almost identical to Mr. Dill's Complaint, were sufficient to proceed to discovery.

> **b)  Even if *McDonnell Douglas* applied to pleadings, Plaintiff has met the standard.**

The test Defendants would use to avoid discovery (which is explicitly an evidentiary test only applicable *after* discovery) does not apply at the pleading stage. But even if it did, the Defendant's arguments would still fail. *McDonnell Douglas* requires a Plaintiff (after discovery is complete) to show "(1) that [he] was a member of a protected class; (2) that [he] was subject to an adverse employment decision; (3) that [he] was qualified for the relevant position; (4) and that [his] employer treated more favorably a similarly qualified person who was not a member of the same protected class." *Ames v. Ohio Dep't of Youth Servs.*, 87 F.4th 822, 824 (6th Cir. 2023).

Taking Mr. Dill's allegations as true, he has pled (1) that as a white male who was discriminated against based on his race and gender, he "was a member of a protected class." *Id.* Mr. Dill (2) "was subject to an adverse employment decision" both when he was placed on a pretextual PIP and when he was later terminated. *Id*. He (3) "was qualified for the relevant position," as demonstrated by his exemplary performance reviews. The Defendant relies on the fourth prong, regarding similarly qualified persons, to argue Mr. Dill's case must be dismissed.[2]

Even if the "similarly situated" inquiry were appropriate here, Mr. Dill's Charge of Discrimination—which is attached to his Complaint and therefore part of the pleadings for Rule 12

---

[2] IBM also appears to question prong 3—Mr. Dill's qualifications—but does so by questioning the facts pled in the complaint and asserting that, contrary to Mr. Dill's allegations, he was also responsible for generating new clients, which is an evidentiary question inappropriate at this stage.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

purposes, *see* ECF No. 11 at 8 n.2, PageID.59—alleged that "[d]uring the time Mr. Dill was on the PIP, IBM continued to hire new employees who met IBM's diversity quotas and incentive structures while taking steps to force him-an older white male-out the door." ECF No. 1-1, PageID.21. These new hires were similarly situated (or less qualified, since they did not have Mr. Dill's experience as an exemplary IBM consultant) workers or potential workers, and they were treated more favorably because of their race and gender, being hired while others were let go.

### c) Mr. Dill has demonstrated background circumstances that support the suspicion that IBM discriminates against majority demographics.[3]

Although the *McDonnell Douglas* framework does not apply at the pleading stage, Defendant leans heavily on a questionable aspect of the test applicable in the Sixth Circuit. ECF No. 11 at 15–16, PageID.66-67. The four-pronged *McDonnell Douglas* framework is, in the Sixth Circuit, slightly modified when applied to cases of what it calls "reverse discrimination." *Sutherland v. Mich. Dep't of Treasury,* 344 F.3d 603, 614 (6th Cir.2003); *see also Ames v. Ohio Dep't of Youth Servs.*, 87 F.4th 822, 825 (6th Cir. 2023), cert. granted *Ames v. Ohio Dep't of Youth Servs.*, No. 23-1039, 2024 WL 4394128 (U.S. Oct. 4, 2024). "In reverse discrimination cases, the first prong of the *McDonnell Douglas* standard has been interpreted to allow a majority plaintiff to establish a *prima facie* case of intentionally disparate treatment when background circumstances support

---

[3] The Plaintiff here recognizes that while the "background circumstances" aspect of the first prong of the *McDonnell Douglas* test is the law of the circuit and this Court is bound to apply it, the Plaintiff objects to the application of this standard as it is inherently incompatible with the text of the Civil Rights Act of 1964. *Ames*, 87 F.4th at 827–28 (Kethledge, J., concurring); *see also, e.g.*, 42 U.S.C. § 2000e-2 (declaring it unlawful for an employer "to discriminate about *any* individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race,") (emphasis added). The law prohibits discrimination based on race or gender with no distinction in the statutes between discrimination and so-called "reverse discrimination." The Sixth Circuit itself has repeatedly expressed "serious misgivings about the soundness of a test which imposes a more onerous standard for plaintiffs who are white or male than for their non-white or female counterparts." *Zambetti v. Cuyahoga Comty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 n.7 (6th Cir. 1994)).

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

the suspicion that the defendant is that unusual employer who discriminates against the majority." *Franko*, 654 F. Supp. 2d at 717 (cleaned up). As in the standard *McDonnell Douglas* case, "[o]nce the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.*

"This requirement is not onerous, and can be met through a variety of means, such as statistical evidence; employment policies demonstrating a history of unlawful racial considerations; evidence that the person responsible for the employment decision was a minority; or general evidence of ongoing racial tension in the workplace." *Johnson v. Metro. Gov't of Nashville & Davidson Cty.,* 502 F. App'x 523, 536 (6th Cir. 2012). The Sixth Circuit has acknowledged the risk that the "background circumstances" requirement "may impermissibly impose a heightened pleading standard on majority victims of discrimination." *Zambetti,* 314 F.3d at 257. "This suggests that the Court should adopt a permissive understanding of the "background circumstances requirement." *Preston v. Fed. Express Corp.,* 373 F. Supp. 3d 1172, 1188 (W.D. Tenn. 2019), citing *Zambetti,* 314 F.3d at 257.

That said, regardless of the permissiveness with which the requirement is treated, Plaintiff has more than met it. The background circumstance required to make out a prima facie case of "reverse discrimination" could be as minor as a minority making the employment decision. *Zambetti*, 314 F.3d at 257 ("[T]he person in charge of hiring for CCC, Chief Harris, was himself African-American. This is sufficient, in our opinion, to satisfy *Murray's* 'background circumstances' requirement."). Mr. Dill, by contrast, has gone much further and alleged, with evidence (even though such evidence is unnecessary at the pleading stage), that IBM had an established corporate policy of financially incentivizing its leaders to discriminate based on race and gender specifically against majority demographics. Indeed, as a matter of policy, leaders who failed to shift the

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

19

demographics of their working groups by at least a percentage point per year would find themselves ineligible for a bonus, ECF No. 1 ¶¶ 65–66, PageID.10-11, which is, by any measure, an "employment polic[y] demonstrating a history of unlawful racial [and gender] considerations," *Johnson*, 502 F. App'x at 536.

### III. IBM's defenses combine non sequiturs with inappropriate evidentiary disputes.

In its motion, IBM repeatedly makes arguments based on either a mischaracterization of Plaintiff's allegations, calls for evidence that is not appropriate at the pleading stage, or a combination of both. For example, Defendant claims that "IBM's commitment to diversity does not support Plaintiff's claims" because "(1) a commitment to diversity is not unlawful; (2) Plaintiff's allegation that IBM had a 'quota system' … is based on bald assertions; and (3) the diversity efforts about which Plaintiff complains had nothing to do with Plaintiff." ECF No. 11 at 17, PageID.68. As to the first point, Plaintiff has not alleged a mere "commitment to diversity," but an explicit racial and gender quota system to which executive compensation is directly tied. ECF No. 1 ¶¶ 65–66, PageID.10-11. At a minimum, this fulfills requirements for establishing a prima facie case of racial and gender discrimination, well ahead of the summary judgment stage when such a prima facie case is required.

The Sixth Circuit has held that the existence of "employment policies demonstrating a history of unlawful racial considerations" is one of the "background circumstances" to consider in a reverse discrimination case. *Johnson,* 502 F. App'x at 536. Moreover, "[t]he background circumstances element only requires a plaintiff to *support the suspicion* that the defendant is that unusual employer who discriminates against the majority; a plaintiff need not prove that the employer's actions *actually* were illegally motivated." *Id.* (emphasis in original, cleaned up). Realistically, however, the explicit racial quotas system goes beyond just supporting the prima facie case, and

provides clear evidence that IBM was unlawfully making employment decisions based on race and gender. *See* 42 U.S.C. § 2000e-2.

As to the second argument, IBM improperly calls for evidence at the pleadings stage. Again, "[a]t the motion to dismiss stage, plaintiffs need only to point to facts that make plausible their allegations." *Inner City Contracting,* 87 F.4th at 755. Moreover, Plaintiff's allegations about IBM's quota system are based on much more than "bald assertions"—in the undercover video, Mr. Krishna declared that it was a corporate policy of IBM to apply unlawful racial and gender quotas at the expense of white males. Mr. Dill has preemptively provided evidence of statements by IBM's top brass expressly referencing *specific* racial and gender quotas. In the video, IBM desired for "blacks" to make up at least 13% of its workforce, "Hispanics" to make up at least "the mid teens," and women to make up at least "slightly over 50[%]." ECF No. 1 ¶ 68, PageID.11. IBM demands details about "how [the quotas] were implemented, or when they were in effect," PageID.63, but such minutiae is precisely why the Federal Rules provide for discovery. The record before the Court is that—based on its corporate filings and in the CEO's words—IBM enforced racial and gender quotas, including specific annual progress metrics, that directly impacted IBM executives' compensation and job security. ECF No. 1 ¶¶ 60–71, PageID.9-11.

IBM works to downplay the significance of these statements by pointing out that the statements are from about two years before Mr. Dill was placed on the PIP. The effort is unpersuasive for at least three reasons. First, this is a weight of evidence argument wholly inappropriate at the pleading stage. Second, Mr. Dill's Complaint explains that these diversity quotas took time to percolate through the corporation. ECF No. 1 ¶¶ 72–78, PageID.12. Third, IBM provides no evidence—or even a bald allegation—that any of Mr. Krishna's discriminatory policies have changed. To the contrary, Defendant admits that it continues to use policies in effect at the time of Mr.

Kirshna's comments. ECF No. 11 at 13–14, PageID.64-65. The discriminatory policies announced at the 2021 corporate town hall meeting were still in effect when IBM took adverse employment actions against Mr. Dill. ECF No. 1 ¶¶ 72–78, PageID.12.

Defendant's further effort to downplay its discriminatory policies by reference to the "Optional Diversity Modifier" is inapposite and inappropriate at this stage in the litigation. Although the documented purpose of *that specified aspect* of IBM's diversity policies may primarily focus on diversifying the executive population (although even that is unclear pre-discovery), the O'Keefe video demonstrates, and Mr. Dill has alleged, that IBM's discriminatory policies establish quotas at all levels of the company. *See* ECF No. 1 ¶ 64, PageID.10, (establishing that the context for Mr. Krishna's comments about IBM's strict racial and gender quota system was a question about "standards for diverse *staffing and leadership*") (emphasis added).

As to the Defendant's third argument, the Plaintiff has cogently pled that these "diversity efforts" were the moving force behind him being put on a pretextual PIP. While IBM claims that "Plaintiff concedes [that] he did not meet the metrics required in his PIP," ECF No. 11, PageID.65, IBM ignores Plaintiff's explanation—that the PIP radically deviated from his job description and called upon him to do things that he had never been required to do in the six preceding years. ECF No. 1 at ¶¶ 40–48, PageID.7-8. This reflects that the PIP itself was pretextual and that Plaintiff was set up for failure. IBM's argument that a "far more reasonable inference from Plaintiff's allegations is that Plaintiff was terminated because he—and a large number of his colleagues—were underutilized" merely supports Plaintiff's allegation that, the PIP was pretextual.[4]

---

[4] Again, at this stage it is inappropriate for IBM to propose alternative inferences or make arguments that would require discovery and evidence to establish, such as the comment about the "large number of [Mr. Dill's] colleagues" who were similarly underutilized.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

According to IBM, Mr. Dill cannot claim that the PIP was pretextual because his Complaint does not mention "the race and gender of his peers from his division" who were similarly situated. ECF No. 11, PageID.65. Yet again, IBM tries to turn an evidentiary question into a pleading requirement. The race and gender of Plaintiff's peers, and how they were treated by IBM, falls squarely within the scope of discovery. *See, e.g.*, *Gover v. Speedway Super Am., LLC,* 254 F. Supp. 2d 695, 703 (S.D. Ohio 2002) ("In light of the fact that discovery had not been completed at the time that Defendant's Motion was briefed, the Court concludes that it would be inequitable to grant summary judgment, at this time, on the basis that there exists no similarly situated employees who were treated differently. Information about which individuals might be similarly situated and the extent to which they received discipline, if any, is solely within the possession of Defendant. Accordingly, Plaintiff should be afforded an opportunity to conduct discovery on this issue prior to any ruling on pretext.").

Moreover, as discussed above, "proof that similarly situated persons were treated differently is not the only way to generate the necessary inference" of discrimination. *Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc.,* 285 F. Supp. 2d 1180, 1186 (N.D. Iowa 2003) (citing *Young v. Warner-Jenkinson Co.,* 152 F.3d 1018, 1022 (8th Cir. 1998)); *see also Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case."). While "an inference of discrimination may be raised by evidence that a plaintiff was replaced by or treated less favorably than similarly situated employees who are not in the plaintiff's protected class," it "does not follow" that "evidence of disparate treatment is the exclusive means by which a plaintiff may

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

establish an inference of discrimination." *Young,* 152 F.3d at 1022; *see also Smith,* 644 F.3d at 1328 ("A plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence … The circumstantial evidence necessary to present a Title VII case of discrimination is flexible and depends on the particular situation.") (cleaned up).

Discrimination is a zero-sum game, particularly where quotas are concerned; for a pre-ferred race or gender to enjoy an increased share of positions at a company, a disfavored race or gender must lose either their jobs (creating spots to be filled by others) or opportunities to be hired. This bit of common sense may help to explain why, for example, the *Rhodes* court had no difficulty inferring age discrimination where the company had explicit average-age targets and the plaintiff's age disserved those targets. *Rhodes*, 491 F. App'x at 584.

Here, as in *Rhodes*, Mr. Dill's exemplary work history, coupled with his membership in classes that were targeted in the undercover video (i.e., white males), gives rise to at least a plausible inference of discrimination. Moreover, the undercover video suggests that discovery may reveal this to be a "direct evidence" claim—in which case, the *McDonnell Douglas* burden-shifting analysis will not apply, and Plaintiff will not need to show pretext. *Rowan v. Lockheed Martin Energy Sys., Inc*., 360 F.3d 544, 548 (6th Cir. 2004).

Finally, IBM cites *Johnson v. Metropolitan Government of Nashville & Davidson County, Tennessee,* 502 F. App'x 523, 535 (6th Cir. 2012), and *McCormick v. Gasper*, No. 22-1033, 2022 WL 16586621, at *4 (6th Cir. Nov. 1, 2022), for the proposition that its "statements reflecting a desire to improve diversity do not equate to direct evidence of unlawful discrimination." ECF No. 11, PageID.65. First, IBM's statements go well beyond a desire to promote diversity and involve hard quotas with pecuniary and career impacts on executives who fail to meet them. Second, those were summary judgment cases, and so are inapposite at the pleading stage. Discovery in *Johnson*

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

24

established that the statements relied upon by the plaintiff were temporally removed from the adverse employment action, were not made by actual decision makers, and/or were not specific enough to represent evidence of discrimination. Discovery revealed similar issues with the plaintiff's proofs in *McCormick*. More to the point, the *McCormick* court found no "evidence of a facially discriminatory policy setting a quota for the number of minority candidates to be hired," because evidence showed that the alleged program "[did] not commit to or require the hiring of more diverse applicants." 2022 WL 16586621, at *4. By contrast, Mr. Dill has alleged and provided evidence that IBM policy *requires* one percentage point of demographic shift in an executive's division per year, or they will be financially penalized.

## **CONCLUSION**

IBM is engaging in the "patently" unlawful act of "outright racial balancing." *SFFA,* 600 U.S. at 223 (cleaned up). Plaintiff's Complaint lays out in detail the "background circumstances" that "support the suspicion that the defendant is that unusual employer who discriminates against the majority," *Zambetti,* 314 F.3d at 255 (citations omitted), and alleged that his pretextual adverse employment action and termination were not related to his performance, but to IBM's discriminatory policies. Defendant's Motion to Dismiss is really a disguised motion for summary judgment, relying as it does on evidentiary argument and demands to apply the *McDonnell Douglas* framework, brought before any discovery has taken place. The motion should be denied.

Dated: November 20, 2024                    Respectfully submitted,

*/s/ Christopher S. Berry*                    */s/ Andrew J. Block*
Christopher S. Berry (P68580)            Reed D. Rubinstein (P40193)
SMITH HAUGHEY RICE & ROEGGE        Andrew J. Block
100 Monroe Center NW                    Laura M. Stell
Grand Rapids, MI 49503                    AMERICA FIRST LEGAL FOUNDATION
Phone: (616)458-3444                        611 Pennsylvania Ave. SE #231
Email: cberry@shrr.com                      Washington, D.C. 20003

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

SHRR\6294658.v1

Telephone: (202) 836-7958
Email:  Andrew.block@aflegal.org
Laura.Stell@aflegal.org
Reed.rubinstein@aflegal.org
*Counsel for Petitioner*

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation