UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RANDALL E. DILL,

      Plaintiff,

                                      Case No. 1:24-cv-852

v.

                                        Hon. Hala Y. Jarbou

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

      Defendant.

_____/

## OPINION

Plaintiff Randall Dill is a former employee of International Business Machines Corporation ("IBM"). He worked in IBM's consulting division for seven years before IBM terminated him. IBM supposedly terminated him for not developing new clients and not meeting client demands. Dill alleges that those reasons are mere pretexts. He contends that IBM terminated him because he is a white male, and as a white male, he did not fit IBM's "preferred demographic." (Compl. ¶ 1, ECF No. 1.) According to Dill, IBM has implemented a policy that incentivizes its management to terminate white men so that IBM's workforce has a higher percentage of minorities and women (the "Diversity Policy"). After IBM terminated Dill, he filed this action asserting race and gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and the Civil Rights Act of 1866, 42 U.S.C. § 1981. IBM moves to dismiss the complaint for failure to state a claim. (Mot. to Dismiss, ECF No. 10.) For the reasons herein, the Court will deny the motion.

# I. BACKGROUND

## A. Factual Background

The following facts are taken from the complaint.  Randall Dill, a white male, alleges he was employed by IBM from October 2016 to October 2023.  (Compl. ¶¶ 21, 56.)  He was a senior managing consultant for IBM Consulting, a division within IBM.  (*Id.* ¶ 22.)  As a consultant, he primarily supported existing IBM clients on long-term projects.  (*Id.* ¶ 23.)  These projects could last for a few months or multiple years.  (*Id.* ¶ 24.)  IBM did not require him to "develop or sign new clients; . . . all of his work was for *existing* IBM clients."  (*Id.* ¶ 26.)  After Dill finished a project with a client, he would be placed in a pool of consultants waiting for a new assignment, a status called "on the bench."  (*Id.* ¶ 25.)

To monitor Dill's performance, IBM used an employee performance metric dubbed the "Net Promotor Score."  (*Id.* ¶ 27.)  The score is based on client feedback.  (*Id.* ¶¶ 28, 29.)  For instance, clients would be asked how likely they are on a scale of 1 to 10 to recommend the IBM employee to other clients.  (*Id.* ¶ 28.)  IBM considers a score of eight and above a sign of good work.  (*Id.* ¶ 31.)  Dill alleges that this score is the primary performance metric IBM Consulting leadership considers when evaluating managing consultants.  (*Id.* ¶ 30.)  In monthly meetings, managers "read quotes from specific reviews to highlight good work."  (*Id.*)

Dill alleges he consistently received high scores in his last four years with IBM.  (*Id.* ¶¶ 32-35.)  From 2019 to 2023, Dill worked on a contract for TACOM, a subsidiary of the United States Army.  (*Id.* ¶ 32.)  He alleges that TACOM never scored him lower than a nine.  (*Id.* ¶ 33.)  In addition, the reviews TACOM gave him "were, on multiple occasions, referenced, quoted, and applauded during monthly [meetings]."  (*Id.* ¶¶ 34-35.)

In light of these positive reviews, Dill was surprised when IBM placed him on a performance improvement plan ("PIP") in July 2023.  (*Id.* ¶¶ 36-37.)  Jay Zook, Dill's supervisor,

claimed that the PIP was due to Dill's "low utilization rate," as well as the fact that Dill was "not bringing in the work" and was not meeting "[c]lient demand." (*Id.* ¶¶ 37, 42.) The PIP set a goal of "[f]ull utilization by November 1." (*Id.* ¶ 46.) Up until that point, however, Dill had received no complaints, warnings, or any other notice that he was not meeting expectations. (*Id.* ¶¶ 36-37.) IBM never told him he was required to sign and develop new clients. (*Id.* ¶ 38.) Indeed, client development was not part of his job description and was not within his control. (*Id.*) Also, Dill had no ability to assign himself to client projects. (*Id.* ¶ 46.) He was like many other employees in his division, over half of whom were "on the bench" at the time. Nonetheless, Dill did what he could to bring in new clients. (*Id.* ¶¶ 49-52.) Yet he did not do enough, according to IBM. (*See id.* ¶¶ 55-56.) So IBM terminated him on October 31, 2023. (*Id.* ¶ 56.)

Dill contends that the PIP was a "pretext to force him out of the company due to IBM's [Diversity Policy]." (*Id.* ¶ 55.) Dill alleges that since at least 2022, IBM has "engaged in sex-and race-balancing in its employment practices." (*Id.* ¶ 59.) He cites several corporate documents as proof.

For instance, IBM's 2024 Notice of Annual Meeting and Proxy Statement states that IBM provides financial incentives for its management to increase diversity in IBM's workforce. IBM, 2024 Notice of Annual Meeting and Proxy Statement 36 (2024) [https://perma.cc/FE9T-6BJ9]. When scoring the performance of its business units for the purpose of determining the compensation that executives will receive, the company applies a "diversity modifier" that is "based on [its] progress in creating and developing a diverse executive population." *Id.* In particular, the company apparently considers "[e]xecutive representation of women globally, as well as Black and Hispanic executives in the United States." *Id.* An increase in that representation can lead to a higher score and higher executive compensation. *See id.*

3

Similarly, the 2023 Annual Report states:

Our focus on creating a diverse and inclusive workplace has led to increased levels of inclusion for underrepresented employees, including women, who make up more than one-third of our workforce.  Executive representation of women globally, and Hispanic executives in the U.S. improved by 1.1 points and 0.5 points, respectively, in 2023.  Representation of Black executives in the U.S. declined 0.2 points in 2023.  Our executive annual incentive program includes a diversity modifier that affirms our commitment to diverse representation in our workforce that reflects the labor pool demographics of the communities in which we operate.  The design of the modifier is based on our progress in creating and developing a diverse executive population.

IBM, 2023 Annual Report 16 (2024) [https://perma.cc/Q7KC-PEK7].

And the 2022 Annual Report states:

Our focus on creating a diverse and inclusive workplace has led to increased levels of inclusion for women, Black and Hispanic employees. Women make up more than one-third of our workforce.  In addition, executive representation of women globally, and Hispanic and Black executives in the U.S. improved by 0.3 points, 0.4 points and 0.6 points, respectively, in 2022.  Our executive compensation program metrics include a diversity modifier to reinforce our focus and continued accountability for improving the diverse representation of our workforce. Globally, our executives are measured on the improvement of diversity and inclusion for women.  In the U.S., executives are also measured on improvement of diversity and inclusion for U.S. underrepresented minorities.

IBM, 2022 Annual Report 16 (2023) [https://perma.cc/5PX2-9L2W].

IBM apparently incentivized its executives to increase the diversity of its workforce as early as 2021, when IBM's CEO and Board Chairman, Arvind Krishna, explained IBM's goals during a corporate town hall meeting.  (Compl. ¶¶ 62-63.)  He said that "all executives in the company have to move forward by 1% on both underrepresented minorities . . . and gender."  (*Id.* ¶ 65.)  Doing such, he explained, "leads to a plus on [their] bonus."  (*Id.* ¶ 66.)  Not doing so would result in loss of part of their bonus or termination.  (*Id.* ¶¶ 66, 70.)  Krishna further stated that he had specific quotas in mind for the company.  (*See id.* ¶¶ 68, 70, 72.)  He wanted half of IBM's employees to be women, thirteen percent to be black, and a percentage in the "mid-teens" to be Hispanics.  (*Id.* ¶ 68.)

4

Because of these policies, Dill claims his supervisors stood to gain financially from terminating him, including Zook, his immediate supervisor, Kevin Henning, Zook's supervisor, and Mike Chamberlain, President of Dill's unit at IBM Consulting.  (*Id.* ¶ 78.)  In short, according to Dill, IBM's "quota system is tied to bonus compensation in such a way that it incentivizes impermissible racial discrimination and disincentivizes refusal to engage in such discrimination." (*Id.* ¶ 77.)

### B. Procedural Background

After IBM terminated Dill, he filed a charge of discrimination against IBM with the EEOC on July 11, 2024.  Eight days later, the EEOC issued Dill his right to sue letter.

Dill claims that IBM violated Title VII's prohibitions against race and gender discrimination when it terminated him.  He also claims that his termination was based on race and thereby violated 42 U.S.C. § 1981.  IBM moves to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### II. LEGAL STANDARD

A plaintiff's complaint must make a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  The statement must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While "[t]he plausibility standard . . . is not akin to a probability requirement . . . it asks for more than a sheer possibility" that the alleged misconduct occurred.  *Id*.

When faced with a motion to dismiss under Rule 12(b)(6), the Court's main inquiry is whether the complaint is plausible.  That is, the Court requires factual allegations, which, as a whole, create a plausible inference that the plaintiff has stated a viable claim.  *See Iqbal*, 556 U.S. at 678; *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345-46 (6th Cir. 2016).  In making that determination, the Court "construe[s] the complaint in the light most favorable" to the plaintiff.

*Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir.2007)).   The Court cannot accept "naked assertions," legal conclusions, or "formulaic recitation[s] of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

Courts are generally bound to consider only the complaint when resolving a motion to dismiss under Rule 12(b)(6), unless the Court converts the motion to one for summary judgment. *Wysocki v. IBM Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).   "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### III. ANALYSIS

Dill claims that IBM terminated him because he is a white male, in violation of Title VII and § 1981.   Title VII prohibits an employer from discriminating against any individual with respect to their "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).   Similarly, § 1981 prohibits racial discrimination in private employment. 42 U.S.C. § 1981; *Quinn-Hunt v. Bennett Enters.*, 122 F. App'x 205, 207 (6th Cir. 2005) (citing *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975)).

Discrimination claims "under § 1981 are analyzed under the same legal framework as Title VII claims." *Greer v. Cummins, Inc.*, No. 22-5663, 2023 WL 9472037, at *3 (6th Cir. Oct. 23, 2023) (citing *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 302 (6th Cir. 2016)); *see Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012) ("We review § 1981 claims under the same standard  as Title VII claims." (quoting *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th

Cir.2009))).  In short, Dill's complaint must allege factual content that suffices to make a plausible

inference that IBM terminated him because of his race or gender.  Put another way,

> although the . . . [c]omplaint need not present "detailed factual allegations," it must allege sufficient "factual content" from which a court, informed by its "judicial experience and common sense," could "draw the reasonable inference," *Iqbal*, 556 U.S. at 678, that [the defendant] "discriminate[d] against [the plaintiff] with respect to [his] compensation, terms, conditions, or privileges of employment, *because of* [his] race [or] sex . . . ." 42 U.S.C. § 2000e-2(a)(1) (emphasis added).

*Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012).

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court created

an evidentiary framework for a plaintiff seeking to prove employment discrimination based on

circumstantial evidence.  *Id.* at 802-06.  That framework has three steps.  First, the plaintiff must

establish a "prima facie" claim of discrimination.  *McNeal v. City of Blue Ash*, 117 F.4th 887, 895

(6th Cir. 2024).  That is, the plaintiff

> must show that [he] (1) was a member of a protected class . . . ; (2) suffered an adverse employment action; (3) was qualified for the position held; and (4) was replaced by someone outside of the protected class or similarly situated non-protected employees were treated more favorably.

*Id.*

Second, after the plaintiff makes that showing, the burden shifts to the employer to

"identify a legitimate, nondiscriminatory reason" for the adverse employment action.  *Id.* (quoting

*Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 325 (6th Cir. 2021)).  Third, once such a reason is

given, the burden shifts to the plaintiff to "prove that the employer's reason is pretextual."  *Id.*  A

plaintiff can prove pretext by showing that the employer's stated reasons "(1) have no basis in fact,

(2) did not actually motivate the action, or (3) were insufficient to warrant the action."  *Id.*

The *McDonnell Douglas* framework is "an evidentiary standard, not a pleading

requirement."  *Keys*, 684 F.3d at 609.  Nevertheless, courts sometimes look to elements of the

prima facie case to assist in deciding whether a discrimination claim is plausible.  *See Morgan v.*

*St. Francis Hosp.*, No. 18-cv-2042, 2018 WL 7348028, at *7 (W.D. Tenn. June 26, 2018) (collecting cases); *Besser v. Tex. Gen. Land Off.*, 834 F. App'x 876, 881 (5th Cir. 2020); *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

Of particular importance here is the showing a plaintiff must make when asserting a "reverse discrimination" claim, such as when a man claims gender discrimination, or when a white person claims race discrimination.  *See Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985); *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008).  In such cases, the plaintiff must demonstrate "background circumstances supporting the suspicion that the defendant is that unusual employer who discriminates against the majority."[1]  *Murray*, 770 F.2d at 67 (quoting *Parker v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981)).  The Court of Appeals has enforced this requirement at the Rule 12(b)(6) stage.  *See Donaldson v. DeJoy*, No. 22-1651, 2024 WL 3493870, at *3 (6th Cir. May 1, 2024) (requiring a plaintiff to *plead* facts showing "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority").

### A. Elements of Discrimination Claim

Dill has alleged sufficient facts to support the elements of a "reverse discrimination" claim, namely, background circumstances and an adverse employment action motivated by Dill's race or gender.

---

[1] The requirement to prove "background circumstances" in reverse discrimination cases is an issue currently before the Supreme Court.  *See Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 118 (Oct. 4, 2024) (No. 23-1039) (granting cert. petition).  For the time being, it is still the law of this Circuit.

### 1. Background Circumstances

Start with the "background circumstances" requirement.  Dill relies on IBM's diversity policy and practices that incentivize executives to alter the composition of the workforce so that it includes a greater percentage of minorities and women.

Generally, "'the mere existence of a diversity policy, without more,' is insufficient to make out a prima case of discrimination under . . . Title VII."  *Weinerth v. Talley*, No. 4:17-cv-0067, 2018 WL 2729205, at *4 (W.D. Va. June 6, 2018) (quoting *Jones v. Bernanke*, 493 F. Supp. 2d 18, 29 (D.D.C. 2007)); *see also McCormick v. Gasper*, No. 22-1033, 2022 WL 16586621, at *4 (6th Cir. Nov. 1, 2022) (explaining that a goal or desire to improve diversity does not equate to discrimination); *Reed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176, 185-86 (D. Del. 2001) ("Merely producing anecdotal evidence regarding the aspirational purpose of an employer's diversity policy, and its intent to ameliorate any underutilization of certain groups, is not sufficient.").

In analyzing whether a diversity policy goes beyond mere aspirational goals, some courts look to whether the policy (1) "define[s] specific quotas for any specific position or the workforce overall," (2) "refer[s] to any caste system designating a hierarchical preference for certain racial groups over others," (3) "provide[s] specific plans for how its diversity goals are to be achieved," *Bradley v. Gannett Co.*, No. 1:23-cv-1100, 2024 WL 3905817, at *5 (E.D. Va. Aug. 20, 2024), or (4) places managers under "pressure to increase minority percentages," *Atkins v. Denso Mfg. Tenn.*, No. 3:09-cv-520, 2011 WL 5023392, at *5 (E.D. Tenn. Oct. 20, 2011).  Other courts have looked to whether a diversity policy was "actually implemented" or "held sway over the decision maker."  *Pilon v. Saginaw Valley State Univ.*, 298 F. Supp. 2d 619, 632-33 (E.D. Mich. 2003).

Dill relies on more than the existence of a stated aspiration or goal.  He alleges that IBM's CEO set specific percentage targets for the racial and gender composition of IBM's workforce and then IBM implemented a system of financial incentives to reward executives who worked to

achieve those targets.  IBM's CEO also suggested that executives who did not make progress could be penalized by being fired or having their pay reduced.  IBM's annual reports in the years following the CEO's statements lend support to Dill's allegations by describing a system of compensation incentives for IBM executives to increase the proportion of women and minorities in IBM's workforce.  Furthermore, Dill alleges that his own supervisors, including the one who put him on the PIP, stood to benefit financially by terminating him because of his skin color and gender.  (*Id.* ¶¶ 70, 78.)  Taken as true, Dill's allegations plausibly support an inference that IBM "improperly consider[s]" race or gender "as a factor in employment-related decisions."  *Toth v. City of Toledo*, 480 F. App'x 827, 832-33 (6th Cir. 2012).

IBM argues that, by its terms, the incentive plan described in its corporate documents only applies to diversity in the "executive" population and Dill does not allege that his position fell within that population.  Even without that specific allegation, however, the Court can make a plausible inference that the incentive plan applied to Dill's position.  Plaintiff expressly alleges that Zook (and Zook's supervisor) had a financial incentive to further the company's diversity goals.  And so far as the Court can tell, IBM's corporate documents do not define "executive," though they do indicate that approximately 4,000 employees fall within that category.  *See* 2024 Notice of Annual Meeting and Proxy Statement 37.  Moreover, those documents do not purport to provide the full details of the incentive program.  Drawing all reasonable inferences in Dill's favor, his allegations are sufficient to draw a plausible connection between the incentive plan and his position.

### 2. Adverse Action

Dill alleges that IBM fired him, which is an adverse employment action.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).

### 3. Discriminatory Motive

As evidence suggesting that Dill's race or gender was the reason for his PIP and subsequent termination, Dill first points to the fact that he was qualified for his position.  In particular, he had worked for the company for several years, he consistently received high performance scores, and he had been praised for his work by a recent client and by his managers.  Nevertheless, his supervisor put him on the PIP, much of which required him to do tasks that had never before been part of his job responsibilities.

The complaint also suggests that IBM treated him more harshly than other, similar-situated employees.  Although his supervisor criticized him for having a "low-utilization rate," Dill apparently alleges that his circumstances were not unusual.  Indeed, over half the employees in his division were "on the bench" at the time.

Also, the new expectations imposed on Dill in the PIP were apparently unrealistic, as he could not control whether IBM signed a new client or whether one of its existing clients chose Dill as its consultant.  These facts tend to suggest that the reasons IBM gave for his PIP and subsequent termination were not the real reasons for its actions.

Finally, Dill alleges grounds for believing that his managers were, in fact, motivated by improper reasons.  He alleges that they had financial incentives to terminate a white male employee like himself in order to alter the racial and gender composition of his division in accordance with IBM's Diversity Policy.  Taken together, all the facts above are sufficient for Dill to state viable claims for race and gender discrimination.

IBM disagrees because Dill does not identify any similarly situated individuals who were treated differently from him.  In doing so, however, IBM improperly imports a requirement for proving a prima facie case to the pleading stage.  As discussed above, a complaint need not plead all the elements of a prima facie case in order to survive dismissal.  Instead, it must plead enough

facts from which to infer that IBM improperly discriminated against him.  Dill has met that requirement.

IBM relies on several cases in which courts noted the lack of allegations regarding similarly situated employees when affirming the dismissal of a discrimination claim.  *See Masaebi v. Arby's Corp.*, 852 F. App'x 903 (6th Cir. 2021); *Smith v. Wrigley Mfg. Co.*, 749 F. App'x 446 (6th Cir. 2018); *Downs v. Del Brands USA, Inc.*, 613 F. App'x 515 (6th Cir. 2015); *Han v. Univ. of Daytona*, 541 F. App'x 622 (6th Cir. 2013); *Mohamed v. Stratosphere Quality*, No. 22-3345, 2022 WL 19826868 (6th Cir. Dec. 20, 2022).  All of these cases are distinguishable.

In *Han*, for instance, the Court of Appeals affirmed the dismissal of Title VII and § 1981 discrimination claims where the complaint "allege[d] no facts, beyond . . . bare and conclusory assertions [of discrimination], from which a person could infer how race or gender factored into the [employer's] decisions about [the plaintiff's] employment . . . ."  *Han*, 541 F. App'x at 627.  In other words, the plaintiff argued that "simply because he was good at his job and was an Asian-American male, he is entitled to a reasonable inference of race and gender discrimination after [his employer] failed to renew his contract."  *Id.*  Dill makes similar allegations, but he also alleges that IBM implemented a company policy that encouraged racial and gender discrimination by his own supervisor.  Dill also plausibly alleges that his supervisor created the circumstances for the termination by imposing a PIP that was unreasonable and inconsistent with Dill's position.  None of the foregoing facts were present in *Han*.

Similarly, in *Smith*, the plaintiff's complaint "did not plausibly link her age and her termination because it merely recited the elements of an age discrimination claim."  *Smith*, 749 F. App'x at 448.  Although the court observed that the plaintiff did not identify any similarly situated employees who were treated differently, it did not hold that such allegations are necessary to bring

12

a discrimination claim.  *See id.* at 448-49.  Instead, it found that there were not sufficient facts to infer age discrimination; the plaintiff's allegations amounted to "naked recitations of the elements unenhanced by specific facts."  *Id.* at 448.  Unlike that case, Dill has alleged additional facts suggesting that his race or gender motivated IBM's conduct towards him.  He has not merely alleged a naked recitation of the elements of a discrimination claim.  *Masaebi*, *Downs*, and *Mohamed* involved circumstances like those in *Smith* and are distinguishable for the same reasons.

## IV. CONCLUSION

In summary, accepting Dill's factual allegations as true, and drawing all reasonable inferences in his favor, it is plausible that IBM's Diversity Policy incentivized his managers to discriminate against white males and that Zook's unrealistic PIP was a means to carry out that policy by creating a pretext to terminate Dill.  At this stage, Dill has provided enough facts to state viable race and gender discrimination claims against IBM.

For the foregoing reasons, the Court will deny Defendant's motion to dismiss the complaint.

Dated: March 26, 2025                              /s/ Hala Y. Jarbou
                                                            HALA Y. JARBOU
                                                            CHIEF UNITED STATES DISTRICT JUDGE